

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Morton Denlow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 04 C 3532 | **DATE** | 1/7/2005 |
| **CASE TITLE** | Robert L. Jones vs. Jo Anne B. Barnhart | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Claimant's motion for summary judgment is granted and the Commissioner's motion for summary judgment [20-1] is denied. This case is remanded to the Commission for further proceedings consistent with this opinion.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | JAN 1 0 2005 | 23 |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | GMA | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 1/7/2005 | |
| DK | courtroom deputy's initials | | date mailed notice | |
| | | | DK | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **ROBERT L. JONES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 04 C 3532** |
| | ) | |
| **v.** | ) | **Magistrate Judge Morton Denlow** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | **DOCKETED** |
| **Commissioner of Social Security,** | ) | |
| | ) | **JAN 1 0 2005** |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case comes before this Court on the parties' cross-motions for summary judgment. Plaintiff Robert L. Jones ("Claimant") challenges the decision of Defendant Jo Anne B. Barnhart, Commissioner of Social Security ("Commissioner"), claiming that her denial of his Social Security Disability Insurance Benefits ("DIB") and Social Security Insurance payments ("SSI") should be reversed or remanded because the decision contains errors of law and is not supported by substantial evidence. For the reasons stated below, Claimant's motion for summary judgment is granted and the Commissioner's motion for summary judgment is denied. The case is remanded to the Commissioner for further proceedings.

### I. PROCEDURAL HISTORY

Claimant filed an application for DIB and SSI on November 27, 2000, alleging that he had been disabled since May 18, 1999, due to a right wrist injury. R. 17, 30. On February

23

6, 2001, the Social Security Administration determined that Claimant was disabled from May 18, 1999, through September 7, 2000, but not thereafter, and awarded Claimant benefits for that closed period. R. 17, 32-34. Claimant's request for reconsideration of this determination was denied, and he requested an administrative hearing. R. 17, 35-46. On November 7, 2002, an administrative law judge ("ALJ") conducted a hearing at which Claimant, represented by counsel, appeared and testified. R. 268-89. In addition, Timothy Bodsoniski testified as a vocational expert ("VE"). R. 289-301. In a decision dated December 10, 2002, the ALJ found that Claimant was not disabled after September 7, 2000, because he had regained the ability to perform jobs that existed in significant numbers in the local economy R. 14-29. This became the final decision of the Commissioner when the Appeals Council denied Claimant's request for review of the decision on December 10, 2003. R. 5-8. Claimant then filed this action for review of the decision pursuant to 42 U.S.C. § 405(g). The parties have consented to this Court's jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c)(1).

## II. BACKGROUND FACTS

Claimant was forty-six years old at the time of the administrative hearing. R. 30, 271. He has an eighth-grade education, and has difficulty reading and writing. R. 98, 276, 285. He is right-handed. R. 285. From 1994 until he injured his wrist in May of 1999, Claimant worked as a temporary laborer, a job that required mostly heavy lifting. R. 80, 290. Prior to that, Claimant held jobs as a leather tanner from 1976 to 1993, as a security guard from

1985 to 1987, and as a housekeeper from 1991 to 1993. R. 80-83. After he injured his wrist, he was unable to perform the lifting his temporary labor job required. He also claims that he suffers from a heart condition that causes him chest pain and shortness of breath.

## A. MEDICAL EVIDENCE

### 1. Wrist Injury and Treatment

Claimant's primary medical complaint is a loss of function in his right wrist. He injured the wrist in a work-related automobile accident on May 18, 1999. R. 145, 172, 270. He was treated at Rush Presbyterian Occupational Health Center, where he was diagnosed with a sprain of the right wrist, given a splint and Naprosyn, and was advised to begin occupational therapy. R. 172. On October 9, 1999, Claimant went to see Dr. John Ruder, who recommended an arthrogram. R. 172. The study revealed a scapholunate ligament[1] tear. R. 172.

On October 30, 1999, Claimant sought treatment for wrist pain in the outpatient department of Norwegian American Hospital. R. 145. Upon examination, Dr. Mohammed Sirajullah determined that Claimant needed a scapholunate fusion, but he asked Claimant to seek additional opinions due to the complicated nature of Claimant's injury and unlikelihood of a completely satisfactory solution. R. 146. On January 4, 2000, Dr. Sirajullah performed a scapholunate fusion and placed a cast on Claimant's arm, but the operation did not result

------------------------

[1] The scapholunate ligament binds together two of the proximal bones of the wrist, the scaphoid and the lunate. It is commonly injured by a hyperextension of the wrist, as by a fall on an outstretched hand. THE MERCK MANUAL, at 494 (17th ed. 1999).

in the healing of the wrist. R. 135-143. Following the procedure, the range of motion in Claimant's wrist was limited: dorsiflexion and palmar flexion were 10 degrees; radial and ulnar deviation were 10 degrees and 15 degrees, respectively. R. 135.

On April 13, 2000, Dr. Sirajullah advised Claimant to undergo a course of physical therapy. R. 135. When Dr. Sirajullah saw Claimant again on May 4, 2000, Claimant had been drinking heavily and admitted that he had gone to only three physical therapy appointments. R. 135. Dr. Sirajullah last saw Claimant on May 23, 2000, at which time Claimant continued to express dissatisfaction with the function of his wrist. R. 135. An x-ray examination showed no changes to the wrist, and there was no bony union at the site of the attempted fusion. R. 135.

On June 21, 2000, Claimant went back to see Dr. Ruder. Upon examination, Dr. Ruder felt that Claimant had a static scapholunate disassociation without sign of fusion of the scapholunate articulation. R. 173. A week later, Claimant saw Dr. Daniel Nagle, who confirmed Dr. Ruder's opinion and diagnosed Claimant with scapholunate disassociation and possible triangular fibrocartilage tear. R. 174. Dr. Nagle noted arthritic changes, and felt a CT scan was needed, as well as possible arthroscopy. R. 174.

On July 26, 2000, Dr. Nagle performed the arthroscopy. Claimant tolerated the procedure well, and awoke from anesthesia "without difficulty." R. 149, 153. The arthroscopy demonstrated diffuse posttraumatic arthritic changes to his right wrist and grade

IV chondromalacia.[2] R. 167. Dr. Nagle recommended that Claimant engage in no "heavy activity" and perform gentle wrist range of motion exercises. R. 167. In a follow-up visit, Claimant informed Dr. Nagle that his pain along the ulnar side of the wrist was gone, and he was able to do "a little work on his car" the day after surgery. R. 167.

Claimant's relief was short-lived, however, and he returned to see Dr. Nagle on August 8, 2000, complaining of pain in his wrist. R. 166. Dr. Nagle suggested that Claimant use a splint and consider undergoing a panarthrodesis operation.[3] R. 166. Claimant demurred, but returned to see Dr. Nagle again on September 7, 2000, because of discomfort in his wrist. R. 163. Dr. Nagle informed Claimant that without further surgery, Claimant had likely reached his maximum medical improvement. R. 163. Claimant informed Dr. Nagle that he was afraid of surgery and would rather simply try to return to work. R. 163. As such, Dr. Nagle recommended a functional evaluation to determine Claimant's work restrictions. R. 163. While the evaluation was scheduled for September 29, 2000, the record fails to indicate that Claimant kept the appointment. R. 165. It would appear that Claimant has not sought further treatment for his wrist since that time.

### 2. Chest Pain

Claimant has also been treated for complaints of chest pain. On April 12, 2001,

---

[2]     Chondromalacia is a softening of the articular cartilage. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, at 321 (28th ed. 1994).

[3]     A surgical fixation of a joint designed to accomplish a fusion of the joint surfaces. DORLAND'S, at 141.

Claimant was admitted to Norwegian American Hospital for chest pain. Claimant admitted to having used cocaine, which was confirmed in testing. R. 192, 195. The attending physician, Dr. Farida Ahmed, found diffuse perfusion abnormalities in all three major coronary arteries, left ventricular dilation, decreased ejection fraction, and severe wall motion abnormalities. R. 189. An EKG performed on April 13, 2001, by Dr. Raghu Ramadurai was characterized as abnormal with sinus rhythm, occasional premature atrial contractions, and left ventricular hypertrophy with ST-wave abnormalities. R. 191. Dr. Ahmed's principal final diagnosis was cardiomyopathy, with atypical chest pain, cocaine abuse, and hypertension. R. 188-89.

On December 13, 2001, Claimant was again admitted to Norwegian American Hospital for chest pain. R. 236-38. Claimant was diagnosed with palpitation, chest pain, and cocaine abuse. Claimant returned on May 22, 2002, again complaining of chest pain, which was, again, apparently associated with cocaine abuse. R. 255.

### 3. Consultative Examination

On July 17, 2001, Dr. Martin Beermann performed a consultative examination of Claimant at the request of the state disability agency, in connection with Claimant's application for disability benefits. R. 211-227. Claimant informed Dr. Beermann that he was able to dress and groom himself independently, take his boys to school and fix them meals, and do light household work such as sweeping, making the beds, cooking, and light dusting. R. 212. Upon examination of Claimant's wrist, Dr. Beermann found that it was difficult to

6

determine whether the joint had fused, but flexion and extension, although limited to 30 degrees out of 60 degrees, had improved from Claimant's previous examination. R. 213-14. Grip strength in Claimant's right hand was 4 on a scale of 5. R. 213. Dr. Beermann observed Claimant use his right hand to tie his shoes, button his shirt, and twist a doorknob, without difficulty. R. 213. X-rays of Claimant's right wrist revealed moderate degenerative changes. R. 218.

With regard to Claimant's chest pain, Dr. Beermann determined that Claimant had reproducible chest pain, which he characterized as atypical. R. 214. Dr. Beermann reviewed Claimant's hospital records, which indicated elevated levels of the enzyme creatine phosphokinase, noting that this was not uncommon in people who use cocaine. R. 214. Claimant explained that he had chest pain all his life, and that incidences of it were not related to exertion. R. 211. For example, Claimant reported that he could easily walk ten blocks. R. 211. Finally, Dr. Beermann acknowledged Claimant's vague complaints about "eye problems" that bothered him when signing his name, although Claimant "state[d] he can read a newspaper without any difficulties." R. 212.

## B.   CLAIMANT'S TESTIMONY

At the administrative hearing, the Claimant alleged that he was unable to work due to his right wrist impairment and chest pain. He said that he would like to work, but he was unable to because of pain. R. 286. He had attempted to work approximately three weeks prior to the administrative hearing, taking a temporary job loading boxes weighing

approximately twenty pounds each. R. 272-73. Two days into the job, he experienced pain in his right hand, which caused the boxes to slip out of his hands. R. 272. After the second day, his hands swelled to the point that he was unable to continue working. R. 273.

Claimant testified that the wrist surgeries he has undergone had not been completely successful. R. 279, 281-83. He said he continued to suffer pain in his wrist and numbness in his right hand. Claimant explained that when his physician, Dr. Nagel, suggested additional surgery, he refused because the surgery was not guaranteed to work. R. 279. In addition, Claimant also related his fears of going under anesthesia, testifying that "they had problems with waking [him] up from anesthesia" and "the nurse she start hitting [him] said breathe, breathe." R. 278, 287

Claimant testified that his cardiac impairment caused severe pain in his chest as well as shortness of breath. R. 270, 280. He said he was short of breath all the time, even when sitting. R. 280. He stated that he used heart patches and nitro pills for relief. R. 278. In response to the ALJ's questioning, Claimant stated that he has not used cocaine since 1999, and he stopped using cocaine because it was making his heart hurt. R. 270, 281.

Claimant related that he had worked as a security guard, but had difficulty filling out the required paperwork. R. 277. A co-worker would have to help him with it. R. 277. When he was transferred to another location where he had no assistance, he was eventually terminated because of his inability to complete the reports. R. 277. He explained that he could read a newspaper a little bit, but had problems spelling. R. 285.

Since suffering his wrist injury, Claimant has spending his time at home with his family. R. 279. His activities have been limited to some household chores: taking care of his two sons by getting them dressed for school and driving them to and picking them up from school, maintaining his own personal hygiene, and doing light chores such as fixing meals, making beds, light dusting, washing dishes, and sweeping. R. 112, 212, 279, 283. As far as his capacity for work activity, the Claimant thought he probably could stand six hours out of an eight-hour workday, and lift twenty pounds for about one-third of a workday. R. 279-80.

## C.    VOCATIONAL EXPERT'S TESTIMONY

Following the Claimant's testimony, the VE testified. The ALJ asked the VE to assume a hypothetical individual of Claimant's age, who was barely able to read or write, who had a residual functional capacity ("RFC") for a restricted range of light work, and needing a sit/stand accommodation and a controlled environment. R. 290-91. According to the VE, such a person could not perform the Claimant's previous jobs as housekeeper, leather tanner, or security guard. R. 291. The VE did identify 4,500 representative jobs that such a person could perform, however: 1,500 jobs at the light level as a machine operator for photo processing, 1,000 jobs as a sorter in the light level with sit/stand option, and 2,000 jobs as a checker. R. 291. The VE added that certain of these were sedentary jobs, including 1,000 jobs in sorting, 1,000 in checking, and 1,100 in photo-processing. R. 292. The ALJ then asked the VE to further assume the hypothetical person could only handle, hold, grasp,

and manipulate occasionally to frequently, and the VE determined that the same jobs were available. R. 292.

Claimant's attorney then questioned the VE regarding the photo processor jobs, suggesting that if writing and cash register duties were involved, such jobs might be beyond Claimant's capabilities. R. 296-97. In response, the VE eliminated 1000 of the photo processing jobs from consideration. R. 296-97. Claimant's attorney continued to question the VE regarding the remaining photo processor jobs but, when the VE was unable to provide a citation to the Dictionary of Occupational Titles ("DOT") for these jobs, the ALJ eliminated them from consideration as well. R. 298. This left the 1,000 sorter jobs and 2,000 checker jobs which the VE then indicated were exclusive, as opposed to earlier in his testimony where he said they were a representative sampling. R. 299.

The Claimant's attorney then questioned the VE as to the requirements of the remaining jobs in terms of the ability to handle, hold, grasp, and manipulate. R. 299. The VE indicated that the sorter job would involve a performance quota, which would put pressure on the worker to move objects within a certain time, but would still require only occasional handling or grasping. R. 299. When prompted for an explanation, the VE allowed that moving the objects would be considered manipulation, and that this would be performed on a "regular" basis. R. 300. Claimant's counsel then attempted to clarify just what a sorter job entailed:

> Q: So occasionally you'd move [objects] but the actual sorting process of the individual units, that would be done on a constant basis?

A: Yes.

Q: And you're manipulating something? You're not just grasping it?

A: Yes.

* * *

Q: Okay. Well, the non-exertional limitation included the restriction of manipulation –

A: And that would be eliminated.

Q: – that would be eliminated?

A: Yes.

Q: Okay. And as far as the checking also?

A: Same thing.

Q: That would be eliminated also. Okay.

R. 300-301. When the ALJ resumed his questioning, he asked the VE what jobs were available if the hypothetical person were limited to only occasional handling, holding, and grasping. R. 301. The VE testified that there would be none. R. 301. Assuming the hypothetical person could perform "up to frequent" handling, holding, and grasping, however, the VE testified that the sorting and checking jobs were available. R. 301.

## D.    THE ALJ'S DECISION

On December 10, 2002, the ALJ found that the Claimant was disabled from May 18, 1999 through September 7, 2000, but not thereafter. R. 14-29. In so doing, the ALJ followed the multi-step analysis applicable to cases in which a disability ends. 20 C.F.R. §§

11

404.1594(f); 416.994(f). R. 18-29. The procedure incorporates the familiar five-step analysis common to disability cases, but also includes considerations regarding medical improvement.

At step one, the ALJ determined that Claimant had not engaged in substantial gainful activity during the relevant period. R. 18. At step two, the ALJ determined that the objective medical evidence, along with Claimant's testimony, showed that neither the wrist nor heart impairments met or equaled the requirements of a listed impairment. R. 19-25. At step three, the ALJ determined that medical improvement had occurred. R. 25. At step four, the ALJ determined that Claimant's medical improvement was related to his ability to do work. R. 25. As a result of his step four determination, the ALJ properly bypassed step five and proceeded to step six. At that point, the ALJ determined that all of Claimant's current impairments were severe because in combination, they caused more than just some minimal impact on his functioning. R. 25.

The ALJ proceeded to step seven, at which point he assessed the Claimant's residual functional capacity ("RFC"). According to the ALJ, the Claimant retained the capacity to perform light work, which the Commissioner's regulations define as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting

12

factors such as loss of fine dexterity or inability to sit for long periods of time. 20 C.F.R. §§ 404.1567(b); 416.967(b). The ALJ found there were additional restrictions on Claimant's capacity for light work, however: no concentrated exposure to dust, fumes, pollutants, chemical irritants, or extremes of temperature or humidity; and a limitation to performing only occasional to frequent handling, holding, grasping, and manipulating using his dominant right upper extremity. R. 26.

In assessing the Claimant's RFC, the ALJ relied on both objective medical evidence and Claimant's own subjective statements. R. 25. The ALJ decided to give little weight to Claimant's subjective statements, however, because the ALJ determined that Claimant was not credible for several reasons. R. 21, 25-26. First, the ALJ noted that the Claimant had testified that the last time he had used cocaine was in 1999, yet laboratory results and Claimant's own admissions to medical personnel indicated that he used cocaine prior to hospital visits in April of 2001, December of 2001, and May of 2002. R. 25, 238. The ALJ also noted that, contrary to Claimant's story regarding his trouble awaking from anesthesia following surgery, the medical evidence indicates he awoke "without difficulty" and had minimal if any after affects. R. 149, 153. Finally, the ALJ found Claimant's testimony of his limited literacy to contradict Claimant's statement to Dr. Beermann during a July 2001 exam that he could read a newspaper without difficulty aside from some vision problems.

The ALJ found that his RFC finding was consistent with Claimant's statement to Dr. Beermann in July of 2001, that he could easily walk ten blocks, as well as Claimant's

testimony that he could lift and carry objects weighing up to twenty pounds occasionally and stand or walk six hours during an eight hour workday. R. 26. Furthermore, the ALJ determined that the nonexertional restrictions against more than frequent handling, holding, grasping, and manipulating would accommodate Claimant's wrist condition. R. 26. After making the RFC determination, the ALJ followed the VE's testimony and determined that Claimant could not perform any past relevant work. R. 27.

At the eighth and final step, the ALJ determined that Claimant could perform other types of work existing in significant numbers in the economy. R. 27-28. Essentially, the ALJ adopted the VE's testimony that a person with the above RFC could work as a sorter or checker. R. 27. While the ALJ acknowledged imposing, during the hearing, additional stricter nonexertional limitations regarding the ability to handle, hold, and grip objects, the ALJ found that such limitations did not apply because applying such limitations depended on Claimant's testimony, and Claimant was not reliable. R. 27. Finally, the ALJ indicated that Claimant's testimony regarding his temporary two day loading job, his unwillingness to seek further surgery or other treatments for his wrist for more than two years, and Dr. Beermann's findings from the July 2001 examination led the ALJ to believe that "claimant has achieved greater symptom relief and wrist function than his testimony would suggest." R. 27.

# III. LEGAL STANDARDS

## A. STANDARD OF REVIEW

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). An ALJ's decision becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Wolfe v. Shalala,* 997 F.2d 321, 322 (7th Cir. 1993). Under such circumstances, the decision reviewed by the district court is the decision of the ALJ. *Eads v. Sec'y of the Dep't of Health & Human Servs.,* 983 F.2d 815, 816 (7th Cir. 1993).

Judicial review is limited to determining whether the ALJ applied the correct legal standards in reaching his decision and whether there is substantial evidence in the record to support the findings. *Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). A mere scintilla of evidence is not enough. *Diaz v. Chater,* 55 F.3d 300, 306 (7th Cir. 1995). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it can not stand. *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

While a reviewing court must conduct a "critical review" of the evidence before

affirming the Commissioner's decision, *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000),

it may not re-evaluate the facts, re-weigh the evidence, or substitute its own judgment for that

of the Social Security Administration. *Diaz*, 55 F.3d at 305-06. Thus, judicial review is

limited to determining whether the ALJ applied the correct legal standards in reaching a

decision and whether there is substantial evidence to support the findings. *Id.; Scivally*, 966

F.2d at 1075. The reviewing court may enter a judgment "affirming, modifying, or reversing

the decision of the [Commissioner], with or without remanding the cause for a rehearing."

42 U.S.C. § 405(g).

## B.    DISABILITY STANDARD

Disability insurance benefits are available to claimants who can establish "disability"

under the terms of Title II of the Social Security Act ("Title II"). *Brewer v. Charter*, 103

F.3d 1384, 1390 (7th Cir. 1997). Supplemental Security Income benefits are available to

"disabled indigent persons" under Title XVI of the Social Security Act ("Title XVI").

*Barnhart v. Thomas*, 540 U.S. 20, 24 (2003). Titles II and XVI of the Social Security Act

employ the same definition of "disability." *Id.* That is, an individual is disabled if that

individual has the "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to last for a

continuous period of not less than 12 months" 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A).

However, a disabled individual is eligible for DIB and SSI only if that individual is under a

disability. 42 U.S.C §§ 423(a); 1382c(a). An individual is under a disability if she is unable

to do her previous work and can not, considering her age, education, and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).

In cases such as the one before the Court, where an individual is determined to be disabled and entitled to DIB for a closed period, the Commissioner uses an eight-step sequential process to determine whether an individual's disability continues. 20 C.F.R. § 404.1594. The ALJ must inquire:

(1) whether the claimant is engaged in any substantial gainful activity;

(2) if not, whether claimant has an impairment or combination of impairments meeting or equaling the severity of an impairment listed in Appendix 1 of 20 C.F.R. Pt. 404, Subpt. P;

(3) if not, whether there has been medical improvement as shown by a decrease in medical severity;

(4) when there has been medical improvement, whether the medical improvement is related to claimant's ability to do work;

(5) if no to steps three or four, whether any exceptions in 20 C.F.R. § 404.1594(d) apply;

(6) if yes to step four, whether all current impairments in combination are severe;

(7) and if they are severe, whether, in considering a claimant's RFC, a claimant can do work done in the past; and

(8) if not, whether the claimant can do other work given the claimant's RFC.

20 C.F.R. § 404.1594(f)(1)-(8).[4]

The RFC is defined as the most an individual can do after considering the effects of physical and mental limitations that affect her ability to perform work-related activities. 20 C.F.R. §§ 404.1545; 416.945. The Commissioner has the burden of proving that Plaintiff has the ability to engage in other work existing in significant numbers in the national economy. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

## IV. DISCUSSION

Claimant raises three issues for review: (1) whether the ALJ made an improper credibility finding and ignored SSR 96-7p; (2) whether the ALJ's RFC finding is not supported by substantial evidence; and (3) whether the ALJ made incomplete hypotheticals, did not follow SSR 00-4p, and failed to meet the burden of establishing the Claimant could perform work existing in significant numbers in the economy. The Court will address each issue in turn.

## A. THE ALJ DID NOT MAKE AN IMPROPER CREDIBILITY DETERMINATION

A court will not reverse an ALJ's credibility determination unless it was patently wrong. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). An ALJ's credibility

---

[4]     Where an individual was previously entitled to SSI, the Commissioner uses a similar sequential process, except that it is a seven-step analysis beginning with consideration of whether the claimant has an impairment or combination of impairments meeting or equaling the severity of an impairment listed in appendix 1 of 20 C.F.R. § 404.1594. 20 C.F.R. § 416.994(b)(5)(i)-(vii).

18

determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (quoting Social Security Ruling 96-7p). It is sufficient if an ALJ's credibility determination allows a reviewing court to "track the ALJ's reasoning and be assured that the ALJ considered the important evidence." *Diaz*, 55 F.3d at 308. In this instance, the ALJ provided sufficient reasoning for his credibility finding, including references to inconsistencies between Claimant's testimony and the other evidence of record, Claimant's treatment decisions, and Claimant's activities.

Inconsistencies between the Claimant's testimony and the medical evidence certainly provided a basis for the ALJ to find the Claimant not credible. For example, the ALJ noted that the Claimant's testimony regarding his cocaine use was not supported by the medical evidence. While the Claimant testified he had not used cocaine since 1999, R. 270, 281, the medical evidence indicated that he had used it on three occasions since then, including a few months prior to the administrative hearing. R. 192, 195, 236-38, 255. Indeed, the medical record suggests that Claimant has sought treatment for his chest pains only in the wake of cocaine use. This is not, as the Claimant contends, an example of the ALJ using Claimant's cocaine use against him, but simply an example of Claimant's testimony being inconsistent with the record, which would support a finding that the Claimant was not credible.

Another such example is the Claimant's explanation of his fear of anesthesia. As the ALJ notes, the Claimant tells a rather vivid tale of his difficulties awakening from anesthesia, which includes a nurse hitting him in an effort to start him breathing. Yet, the medical record lends no credence to this story, indicating instead that the Claimant had no trouble with anesthesia and awoke without difficulty. R. 149, 153. In addition, the ALJ also questioned the Claimant's testimony regarding his limited literacy, contrasting it with Claimant's statement to Dr. Beermann that, aside from a vision problem, Claimant could read a newspaper without difficulty.

The ALJ also considered the Claimant's choice of treatment in assessing his credibility. The ALJ noted that the Claimant was not compliant with physical therapy, missing appointments or arriving intoxicated. He also noted that the Claimant took only over-the-counter medication for his wrist pain. The Claimant argues that these comments amount to the ALJ "playing doctor," by improperly offering his lay opinion on the Claimant's medical condition. Typical cases of ALJs impermissibly "playing doctor" are when they either reject a doctor's medical conclusion without other evidence, *see Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir.2001), or when they draw medical conclusions themselves about a claimant without relying on medical evidence. *See, e.g., Green v. Apfel*, 204 F.3d 780, 782 (7th Cir. 2000). Here, the ALJ did neither of these things, but merely considered the Claimant's choice of medical treatment in assessing his credibility, which is entirely appropriate. SSR 96-7p; *Donahue v. Barnhart*, 279 F.3d 441, 444 (7th Cir. 2002)(reference

20

to reliance on over-the-counter analgesics appropriate to credibility determination). In so doing, the ALJ found Claimant's reliance on non-prescription medication and failure to attend physical therapy impacted adversely on the Claimant's credibility.

Finally, the ALJ also properly considered the Claimant's daily activities in his assessment of the Claimant's credibility. In this regard, the ALJ noted that the Claimant cared for his two children, ages 9 and 5, drove them to and from school, maintained his own personal grooming and hygiene, and did light household chores such as cooking, sweeping, making the beds, and dusting. R. 22. He also noted that the Claimant could tie his shoes, button and unbutton his shirt, and turn a doorknob, all without apparent difficulty.[5] R. 22. Adding these considerations to the ALJ's discussion of Claimant's medical treatment and the inconsistencies between his testimony and the medical record, the Court cannot find the ALJ's credibility determination was patently wrong.

## B.   THE ALJ'S RFC DETERMINATION IS SUPPORTED BY SUBSTANTIAL EVIDENCE

The ALJ determined that Claimant could do light work with additional restrictions of a controlled work environment involving no concentrated exposure to dust, fumes, pollutants, chemical irritants, or extremes of temperature or humidity, and only occasional to frequent

---

[5]   The Claimant mischaracterizes this portion of the ALJ's decision, arguing that the ALJ should not have relied on Claimant's comments to Dr. Beermann that he could perform these activities without considering whether he had any difficulty. (*Plaintiff's Reply to Defendant's Memorandum*, at 4-5). In fact, however, the record reveals, not that these were Claimant's comments, but that Dr. Beermann *observed* plaintiff perform these activities "without difficulties." R. 213.

handling, holding, grasping, and manipulating using his dominant right upper extremity. R. 28. Claimant argues that he is unable to perform light work because it requires lifting and carrying at a level beyond his limitations, and because it does not accommodate the shortness of breath he experiences due to his cardiac condition. In order to make this RFC determination, the ALJ relied upon the medical and non-medical evidence, including Claimant's testimony and comments to physicians. R. 25-27. These factors constitute substantial evidence in the record to support the ALJ's RFC determination.

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. §§ 404.1567(b); 416.967(b). Claimant testified that he thought he would be able to lift twenty pounds for two and a half hours out of an eight-hour workday. R. 280. In addition, despite Claimant's wrist injury, clinical testing revealed that he maintain a grip strength of 4/5 in his right hand. R. 213. The medical evidence also indicates that, while the range of motion in Claimant's wrist is limited, it had improved from being severely restricted. Thus, while Claimant has limitations resulting from his wrist injury, there is substantial evidence to demonstrate that he is able to perform the restricted range of light work of which the ALJ found him capable.

Light work also may require a good deal of walking or standing. 20 C.F.R. §§ 404.1567(b); 416.967(b). In this regard, the Claimant testified that he could stand six hours out of an eight-hour workday given the understanding that he would be able to sit down occasionally. R. 279. Furthermore, he also indicated that he did not experience chest pain

or shortness of breath upon exertion, and said he could easily walk over ten blocks. R. 212. Indeed, according to Claimant's comments to Dr. Beermann, he has had chest pain and shortness of breath his whole life, R. 212; so he has worked despite it in the past. Again, there is substantial evidence in the record to support the ALJ's RFC determination.

The Claimant also argues that the ALJ failed to include a sit/stand option in his findings despite presenting it in a hypothetical to the VE. It is true that, while the ALJ originally included a sit/stand option in the hypothetical he posed to the VE, R. 291, he did not include this limitation in his RFC determination. R. 26, 28. It is likely that this was deliberate: the ALJ simply did not conclude that a sit/stand option was a necessary component of Claimant's RFC given the evidence. Nevertheless, the VE indicated that a sit/stand option would not adversely impact upon the jobs available: photo processor, sorter, or checker. R. 291-92. As such, the ALJ's omission of a sit/stand option from his findings – even if inadvertent – would amount to no more than harmless error in this instance.

## C. THE TESTIMONY OF THE VE NECESSITATES A REMAND OF THIS CASE

Claimant argues that the ALJ's conclusion that Claimant was not disabled as of September 7, 2000, is not based on substantial evidence because of flaws in the vocational evidence upon which the ALJ relied. More specifically, the Claimant argues that the ALJ committed errors in his questioning of the VE, failed to follow Social Security Ruling 00-4p, and ultimately failed to meet his burden of establishing that the Claimant can do work that exists in significant numbers in the economy. The Court, however, is most concerned with

the ultimate question of whether substantial evidence supports the ALJ's conclusion that the Claimant could perform work as a sorter or checker. In his opinion, the ALJ determined that Claimant could engage in no more than "frequent" manipulation during a workday, R. 28, a restriction that would not allow the Claimant to perform a job requiring "constant" manipulation. While it is true that the ALJ was able to elicit testimony from the VE suggesting that the Claimant, even so restricted, could perform the sorter and checker jobs, the ALJ failed to address the contradictory VE testimony: testimony that tends to establish that the sorter and checker jobs are beyond the limitations of the Claimant's RFC. Because the ALJ neglected this testimony, and the testimony upon which the ALJ relied to reach this conclusion is, at best, equivocal, the Court finds that a remand is warranted in this case.

The VE began his testimony by indicating that a hypothetical individual of Claimant's age, who was barely able to read or write, who had a residual functional capacity ("RFC") for a restricted range of light work, needing a sit/stand accommodation and a controlled environment, and a further restriction limiting the hypothetical person's ability to handle, hold, grasp, and manipulate in the range of occasionally to frequently, could perform 4,500 jobs in the local economy. R. 290-92. These jobs included 1,500 positions as a photo processing machine operator, 1,000 positions as a sorter, and 2,000 positions as a checker. R. 291. Moreover, the VE testified that these positions were merely a representative sampling of the work such an individual could perform. R. 291. Upon cross examination from Claimant's attorney, however, this job base deteriorated rapidly.

First, it became apparent that the VE had not considered the reading and writing requirements of about two-thirds of the photo processing jobs. R. 295-96. As to the remaining third, it became apparent that they might require more manipulation and grasping than was envisioned by the hypothetical. R. 297-98. Eventually, when the VE was unable to support his statements about the photo processing job with a citation to the DOT, the ALJ simply eliminated it from consideration.[6] R. 298. Fairly quickly, then, more than one-third of the jobs the VE originally gave as representative examples of work he thought the hypothetical individual could perform were gone.

Next, the ALJ attempted to refresh the VE's memory by restating the hypothetical and asking what other job might replace the photo processing job. R. 298. While the VE had originally indicated that the photo processor, sorter, and checker positions were merely representative, he then indicated that they were *exclusive*. R. 298. There were no jobs other than sorter and checker that the hypothetical individual could perform. Thus, as the

_____

[6]     Claimant argues that the ALJ failed his duty pursuant to Social Security Ruling ("SSR") 00-4p to inquire about any possible inconsistency between the VE's testimony and the DOT. The ruling states that "[w]hen a VE ... provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE['s] ... evidence and information provided in the DOT." Where "no one questions the vocational expert's foundation or reasoning, however, an ALJ is entitled to accept the vocational expert's conclusion, even if that conclusion differs from the [DOT's]." *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002). Thus, an ALJ must explain a discrepancy between the VE and DOT only when the discrepancy has been identified, and raising a discrepancy after a hearing has ended is untimely. *Id.* In this case, the only DOT discrepancy raised at the hearing was in regard to the photo processing job, which was eliminated from consideration. As such, the dictates of SSR 00-4p did not impinge on the ALJ's decision.

administrative hearing progressed, the VE significantly changed his testimony from offering three representative examples of many jobs he felt the hypothetical individual could perform to offering just two specific jobs. The job base in consideration had dwindled once more, and would continue to do so as the VE continued to testify.

The job base available to the hypothetical person became less concrete as the Claimant's attorney questioned the VE regarding the amount of manipulation the checker and sorter jobs required. Initially, the VE seemed to forget that there was a manipulation restriction in the hypothetical. He testified that the sorter job required handling and grasping on only an occasional basis. R. 299. He did allow, however, that it would involve constant moving of objects which, upon reflection, he admitted would constitute constant manipulation. R. 300. He admitted the same would be true of the checker job. R. 300-301. As it turned out, then, there was *constant* manipulation required in the sorter and checker jobs. R. 300-301. As the hypothetical allowed for only *occasional to frequent* manipulation, the VE conceded that the sorter and checker jobs would be eliminated. R. 300-301. Thus, there were no jobs the hypothetical individual could perform. While it is true that a moment later, upon questioning from the ALJ, the VE stated that the jobs would be available to someone who could perform *frequent* manipulation, the damage had been done.

In the end, the ALJ based his conclusion that the Claimant was not disabled on the VE's testimony. That testimony, as discussed, is equivocal at best; at worst it tends to more convincingly support the opposite conclusion. In either case, it can hardly be considered

26

substantial evidence to support the ALJ's decision. To make matters worse, the ALJ made no mention of the testimony Claimant's counsel elicited on cross-examination in his decision that indicated the Claimant was disabled. He simply clung to the nugget that supported his conclusion. A claimant's opportunity to question the vocational expert on cross-examination is significant. *Ragsdale v. Shalala,* 53 F.3d 816, 819 (7th Cir. 1995). Certainly, when that cross-examination elicits testimony of the nature elicited here, the ALJ ought to consider and discuss it. *Connor v. Shalala,* 900 F.Supp. 994, 1003 (N.D.Ill. 1995). The ALJ here simply ignored it and, while the ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to his ruling. *Golembiewski v. Barnhart,* 322 F.3d 912, 917 (7th Cir. 2003). When he does, it is impossible for a reviewing court to tell whether the ALJ's decision rests upon substantial evidence. *Id.* That is just what the ALJ did here by failing to discuss – or even mention – the bulk of the VE's testimony. Accordingly, the Court must remand this case to the Commissioner because the ALJ ignored an entire line of vocational evidence.

## V. CONCLUSION

For the reasons set forth in this opinion, **Claimant's motion for summary judgment**
is granted and the Commissioner's motion for summary judgment is denied. This case
is remanded to the Commissioner for further proceedings consistent with this opinion.

**SO ORDERED THIS 7th DAY OF JANUARY, 2005.**

_____
**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies mailed to:**

David A. Bryant
Daley, DeBofsky & Bryant
1 North LaSalle St., Suite 3800
Chicago, IL 60602

Attorney for Plaintiff

Kimberly S. Cromer
Special Assistant United States Attorney
200 West Adams Street, 30th Floor
Chicago, IL 60606

Attorney for Defendant